1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6
7

TUG CONSTRUCTION LLC,

8                        Plaintiff,

9        v.

10   HARLEY MARINE FINANCING LLC,

11                       Defendant.

CASE NO. 2:19-cv-00632-BAT

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

12
13
14
15
16
17
18
19

In 2019, Plaintiff Tug Construction, LLC ("Tug Construction") commenced an action against Defendant Harley Marine Financing, LLC ("HMF"). Dkt. 1. Tug Construction alleged HMF breached its maritime bareboat charter contracts with respect to the following vessels: DR. HANK KAPLAN, EARL W. REDD, LELA FRANCO, MICHELLE SLOAN, and RICH PADDEN. *Id.* The parties consented to Magistrate Judge Brian A. Tsuchida, Dkts. 14, 16, and Judge Tsuchida conducted a Court Trial between August 22, 2022, and August 26, 2022. Dkts. 97-101. Following trial, the parties submitted post-trial pleadings and proposed findings of fact and conclusions of law.

20
21
22
23

The Court has considered the parties' submissions and the record and makes the following findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a). Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

1

## FINDINGS OF FACT

2     1.     Tug Construction is a Washington State Limited Liability Company with its

3 principal place of business in Seattle. Tug Construction owns the five tugboats at issue in this

4 case, the DR. HANK KAPLAN, EARL W. REDD, LELA FRANCO, MICHELLE SLOAN, and

5 RICH PADDEN (the "Tugboats"). Dkt. 87 (Joint Pretrial Order -Admitted Facts). Diversified

6 Marine Services, Inc.("DMS"), located in Portland, Oregon, constructed the Tugboats. *Id.*  Tug

7 Construction was created by Harley Franco and Kurt Redd to construct tugboats to charter to

8 Harley Marine Services, Inc. ("HMF") and its subsidiaries. Verbatim Report of Proceedings

9 ("VRP") 8/22/22 p. 13-15 and 46.

10     2.     HMF, a subsidiary of Harley Marine Services, Inc. ("HMS"), is a Delaware

11 Limited Liability Company with its principal place of business located in Seattle Washington. *Id.*

12 Harley Franco was HMF's chief operating officer from 1987 to March 31, 2019. VRP 8/22/22 p.

13 44-45.[1]

14     3.     The Tugboats were newly constructed by DMS, delivered to, and accepted by

15 HMS for charter under identical Bareboat Charter Agreements. The Bareboat Charter

16 Agreements were later assigned to and assumed by HMF (in 2018). VRP 8/22/22 p. 46-49; 86;

17 Admitted Facts, ¶ 8.

18     4.     The Bareboat Charter Agreement for the MICHELLE SLOAN dated March 27,

19 2015, between Plaintiff and Millennium Maritime, Inc. (a wholly owned subsidiary of HMS),

20 was assigned to and assumed by HMF. VRP 8/22/22 p. 57; Ex. 70, 71. The Bareboat Charter

21 Agreement for the LELA FRANCO dated June 19, 2015, between Plaintiff and Millennium

22

23

---

[1] The Court's Findings and Fact and Conclusions of Law refer to both Defendant HMF and HMS depending on the testimony, relevant exhibits, and timing of conduct before and after the undisputed assignment of the Bareboat Charter Agreements from HMS to HMF.

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 2

1   Maritime, Inc., was assigned to and assumed by HMF. VRP 8/22/22 p. 78; Ex. 41, 43. The

2   Bareboat Charter Agreement for the EARL W REDD dated January 30, 2017, between Plaintiff

3   and Olympic Tug & Barge, Inc., was assigned to and assumed by HMF. Ex. 25, 26. The

4   Bareboat Charter Agreement for the DR HANK KAPLAN dated June 9, 2017, between Plaintiff

5   and SMS PNW, was assigned to and assumed by HMF. Ex. 5, 7. The Bareboat Charter

6   Agreement for the RICH PADDEN dated October 25, 2017, between Plaintiff and Starlight

7   Marine Services PNW, Inc., was assigned to and assumed by HMF. Ex. 85, 86. HMS accepted

8   the MICHELLE SLOAN, LEILA FRANCO, EARL REDD, and RICH PADDEN at DMF in

9   Oregon. VRP 8/22/22 p. 54, 72, 76; VRP 8/25/22 p. 145, 17-25, 146, 1-5, 179; Exhibits 1, 2, 38,

10   66, 82. HMS accepted the HANK KAPLAN in Seattle after a christening run from Portland.

11   VRP 8/22/22 p. 85.

12      5.      In 2019, Tug Construction provided HMF with written notice of intent to

13   terminate each Bareboat Charter Agreement. Notice of Termination was given on January 3,

14   2019 that the DR. HANK KAPLAN be redelivered on or about January 31, 2019 (Ex. 8); Notice

15   of Termination was given on January 3, 2019 that the EARL W. REDD be redelivered on

16   February 28, 2019 (Ex. 27); and Notice of Termination was given on February 12, 2019 that the

17   RICH PADDEN, MICHELLE SLOAN, and LELA FRANCO be redelivered on February 28,

18   2019 (Ex. 44); *see also* Admitted Facts, ¶¶ 14-18.

19      6.      HMF tendered for redelivery, the DR. HANK KAPLAN on February 1, 2019; and

20   the EARL REDD, MICHELLE SLOAN, and RICH PADDEN on February 28, 2019. HMF

21   tendered for redelivery these four Tugboats at the HMS facility in Seattle, Washington. HMF

22   agreed to tender for redelivery the LELA FRANCO in the Port of Los Angeles by March 8,

23   2019. Ex. 45. After redelivery did not occur, Tug Construction initiated a possessory action, and

the LELA FRANCO was arrested and tendered for delivery to Plaintiff by the U.S. Marshal to Plaintiff on April 3, 2019. Ex. 48-49.

7.     The Bareboat Charter Agreements were drafted by counsel for HMS at the direction of its CFO Todd Prophet. Mr. Franco recused himself as a representative for HMS, as to the Bareboat Charter Agreements, and Mr. Prophet approved and signed each Bareboat Charter Agreement on behalf of HMS for each Tugboat except for the RICH PADDEN. VRP 8/22/22 p. 60, 19-25. 61, 25, 62, 66, 83. Matt Godden, the current chief operating officer of HMS, signed the Bareboat Charter Agreement for the RICH PADDEN. VRP 8/25/22 p. 88, 89, 92; Exhibit 85. The Bareboat Charter Agreements for each Tugboat is identical, other than the names of the charterer, vessel identification information and charter hire rates. Each Bareboat Charter Agreement states, in pertinent part:

> The Charter shall automatically renew and extend in perpetuity until and unless terminated by either party in writing. This is a triple net lease which includes back fees and other miscellaneous charges.

> 1.     BASIC AGREEMENT

> Owner agrees to let and Charterer agrees to hire, on a bareboat charter basis, the Vessel[2] identified above pursuant to the terms and conditions of this agreement; the term Vessel shall include the Vessel identified above as well as all machinery, equipment, consumables, stores, furnishings and gear aboard the Vessel at the time of delivery to Charterer.

> The bareboat charter term shall commence on the delivery date/time identified above or the actual date/time on which the Charterer accepts and assumes control of the Vessel, whichever shall first occur, and continue until the Vessel has been redelivered as set forth herein.

---

[2]The Bareboat Charter Agreement refers to each of the Tugboats as the "Vessel" covered by the agreement. For ease of reference, the Court has referred to the specific vessels as Tugboats throughout these Findings of Fact and Conclusions of Law.

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 4

2.      HIRE, CHARGES AND INTEREST

Charterer shall pay hire, at the rate identified above, from delivery to redelivery, with payment due monthly in advance on the first day of each month, unless otherwise agreed. In the event of total or constructive total loss, hire shall continue until Owner has received full payment of the Vessel's agreed value under its hull and machinery policy.

Charterer shall be responsible for all charges and expenses of every kind and nature whatsoever relating to the Vessel/and or its use or operation during the charter term. Charterer shall be responsible for all taxes, except such taxes as are specifically applicable to Owner by virtue of its receipt of hire under this agreement.

Amounts dues to Owner shall be pain in US currency without discount or set-off; sums not paid shall accrue interest at a rate of (1%) per month.

In the event of total or constructive loss of the Vessel during the charter term, Charterer shall be obligated to pay hire until Owner has received full value under the Vessel's hull and machinery policy identified below.

3.      WARRANTIES AND REPRESENTATIONS

The Vessel is bareboat chartered on an "AS-IS" basis with no Warranty or representation of any kind or nature whatsoever by Owner. Charterer shall have full opportunity to inspect Vessel prior to delivery to determine its condition and suitability for service and may additionally arrange for separate inspection by a maritime surveyor or similar technical representative at its expense.

IT IS SPECIFICALLY ACKNOWLEDGED AND AGREE THAT OWNER MAKES NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EXPRESS OR IMPLIED, REGARDING THE CAPABILITY, CONDITION, SEAWORTHINESS, FITNESS OR SUITABILITY OF THE VESSEL.

5.      REPAIRS, MAINTENANCE AND ALTERATIONS

Charterer shall make all repairs, replacements and maintenance necessary to keep the Vessel in the same good condition, repair and working order as when delivered, less normal wear and tear

(which does not include any damage or deterioration correctible through routine maintenance). Charterer shall not install any gear or equipment on or make any alterations or additions to the Vessel without Owner's prior written consent. Any additional gear, equipment, alterations or additions allowed by Owner shall be Charterer's property and removed at Charterer's expense prior to redelivery.

6.      SURVEYS; DELIVERY AND REDELIVERY

Prior to or at delivery, the Vessel shall be surveyed to comprehensively document its condition. The parties may agree upon an appropriate method by which to survey the Vessel and establish its condition, including drydocking and/or underwater inspection, but any method agreed must include written and photographic documentation. At the conclusion of the charter term (or sooner, at the Owners' option in the event of default), an off-hire survey of the Vessel shall be conducted upon the same method utilized for the on-hire survey, to establish the condition of the Vessel for redelivery. Every effort shall be made to have the off-hire survey conducted by the same person who conducted the on-hire survey.

The Vessel shall not be deemed redelivered until at the agreed redelivery location and in the same good condition, repair and working order as upon delivery, less ordinary wear and tear. If Charterer tenders the Vessel damaged and/or in need of repair, hire shall continue during the time required for such repairs and the Vessel shall not be deemed redelivered until restored to the same good condition, repair and working order as upon delivery, less ordinary wear and tear.

7.      INSURANCE

        Charterer shall procure and maintain, at its expense, the following insurances upon the Vessel during the charter term:

        a.      hull and machinery insurance pursuant to Pacific Coast Tug/Barge Form (1979), to its full market value;

        b.      protection indemnity insurance pursuant to Form SP-23 (I/56), with limits of no less than $5,000,000 per occurrence;

c.      pollution and environmental liability insurance, including certificate of financial responsibility, to the extent and with limits as required by law; and

d.      if required by Owner and Owner's lender holding a mortgage on the Vessel, breach of warranty insurance in the amount required by such mortgage.

Each insurance shall be subject to Owner's approval name Owner as insured, be endorsed as primary to any insurance of Owner, and endorsed to require thirty (3) days written notice to each insured (including Owner) in the event of cancellation, nonrenewal or other material change in policy terms or conditions.

All deductibles, premiums and other policy changes shall be for Charterer's account. Owner and Charterer shall be co-loss payees on the hull policy except Owner shall be sole loss payee in the event of a total or constructive loss. If required, Owner's lender shall be sole insured and sole loss payee upon the breach of warranty policy.

 Charterer shall indemnify and hold Owner harmless (including legal fees and costs) of and from any loss, damage, expense, liability, claim or suit resulting from the failure to procure and/or maintain any insurance as required herein and/or for failure of any such insurance, including exposure to any loss, damage, expense, liability, claim or suit which would have been covered had the insurance been procured and maintained as required herein.

9.      MISCELLANEOUS PROVISIONS

d.      This agreement shall be governed by the general maritime law of the United States, or, in the absence of an applicable general maritime rule of law, by the laws of the State of Washington. Any suit filed relating to this agreement must be filed in Seattle, Washington, with the substantially prevailing party to recover its legal fees and costs.

f.      Entire Agreement  Charterer shall not subcharter the Vessel or assign this agreement without Owner's prior written consent. This agreement may not be modified except through a writing signed by both parties. This agreement constitutes the entire agreement between the parties and replaces all prior contemporaneous agreements, written and oral.

Exhibits. 5, 25, 41, 70, 85.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7

8.      The parties' dispute arises from the condition of each Tugboat when HMF tendered them for redelivery to Tug Construction. Tug Construction contends HMF breached each Bareboat Charter Agreement by failing to properly maintain each Tugboat and failing to return each Tugboat in the condition required by the Bareboat Charter Agreements. Tug Construction consequently seeks damages for unpaid hire (rental payments), repair costs, and other associated costs, fees, and insurance. HMF contends it tendered each Tugboat in a condition that met the requirements of each Bareboat Charter Agreement, and that the costs and fees claimed by Plaintiff are excessive or are not required under the Bareboat Charter Agreements. Tug Construction contends the Court should award it damages against HMF for breach of contract in the amount of $1,408,970.27 for the costs related to repairing the Tugboats and continuing charter hire. Tug Construction also seeks incidental expenses of $49,429.59 and prejudgment interest at the rate of 1% per month for continuing hire expenses. HMF contends the Court should award $54,073.22.

9.      DMS constructed each Tugboat per specifications provided by HMS. Dkt. 87; 8/22/22, p. 49. Each Tugboat was inspected during its construction by a team that included DMS employees and Brian Appleton, then an HMS employee and its Director of Tug Systems and Tug Special Projects. 8/22/22 VRP p. 177. Mr. Appleton and Mr. Nelson (also an HMS employee) served as representatives to the Owner, Tug Construction, and Mr. Appleton served as a representative to both Tug Construction and the Charterer, HMS, while each of the Tugboats were being constructed, inspected and subject to sea trials. VRP, Aug. 23, 2022, p. 8.

10.      Representatives of manufacturers for certain components also inspected each Tugboat. Mr. Appleton participated in inspecting the Tugboats during construction and inspected each Tugboat's hull pre-launch and found no problems. Mr. Appleton took photos and notes

1   regarding the condition of each Tugboat, which he submitted to HMS. 8/22/22 VRP 182, p. 83.

2   Mr. Appleton also prepared for each Tugboat a written report following each Tugboat's sea trial.

3   *Id.* Mr. Appleton's inspection of each Tugboat found nothing wrong with each Tugboat when

4   each Tugboat was accepted by HMS under the Bareboat Charter Agreements except for the DR.

5   HANK KAPLAN.  *Id.* at 190. The DR. HANK KAPLAN was conditionally accepted subject to

6   exceptions set forth on a "punch-list" that Mr. Appleton created after sea trials were conducted.

7   The punch-list set forth repairs that HMS requested DMS perform as an "exception" to

8   acceptance of the Tugboat. The deficiencies listed on the punch-list were corrected, and HMS

9   accepted the DR. FRANK KAPLAN. VRP 8/23/22, p. 82-83. For newly constructed vessels that

10  have been accepted for bareboat charter following inspection during construction, launch, and

11  sea trials, another dry-dock inspection is normally not performed following sea trials. VRP

12  8/23/22, p. 126, 152, 153, 162; VRP 8/24/22, p. 90. Other than the inspection process during

13  construction, launch and the sea trials, no separate independent prelaunch or "on-hire" survey of

14  the Tugboats was performed. A dry dock inspection of each Tugboat was also not performed

15  after the sea trials were completed. VRP 8/24/22, p. 95-96.

16          11.     Steve Carlson, the Vice-President of HMS's engineering department when the

17  Tugboats were constructed, delivered, and accepted by HMS, also visited DMS about ten times.

18  Mr. Carlson testified he discussed with Mr. Appleton that each Tugboat had been inspected

19  before HMS accepted the Tugboats for delivery, VRP 8/25/22, p. 153, 190-191, and that HMS

20  accepted the Tugboats at DMS in Oregon, except for the DR. HANK KAPLAN. *Id.* at 182.

21          12.     At the time HMS accepted each Tugboat, each Tugboat was newly constructed by

22  DMS. Each Tugboat had been inspected and tested as set forth above. The conditions later found

23  below the water line on each Tugboat when each vessel was tendered for redelivery and the need

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 9

1  for dry dock repair work did not exist when HMS accepted the Tugboats but developed at some

2  point later during the term of the Bareboat Charter Agreements. The suggestion the Tugboats

3  were damaged before HMS accepted the vessels or already had below the water line (each of the

4  conditions that were later repaired when the vessels were tendered for redelivery), are

5  unsupported.

6       13.    During the time each Tugboat was under the Bareboat Charter Agreement with

7  HMS and thereafter HMF, each vessel was subject to periodic inspection for all types of

8  equipment on the vessel and the condition of each Tugboat above and below the water line.

9  8/22/22 VRP 191-192. HMS had a predictive and reactive maintenance program that was kept on

10  a computer which the Court shall refer to as "E-maintenance system." *Id.* at 192-93. Predictive

11  maintenance involves maintenance performed on a schedule to avoid component failure. *Id.* at

12  196.

13       14.    The accuracy of the information contained in the E-Maintenance system relied

14  upon the accuracy of the information an employee input into the system. VRP 8/25/22, p. 132.

15  Mr. Appleton observed alterations to predictive or scheduled maintenance on the E-maintenance

16  system. *Id.* at 196-198. Predictive maintenance also required certified Caterpillar (CAT)

17  mechanics to inspect and service CAT equipment and this was not done. *Id.* at 199-200. The E-

18  maintenance records showed predictive maintenance work that was supposed to be done by a

19  certified CAT mechanic was being performed by crew members of the Tugboats who were not

20  qualified to perform such work.  *Id.*

21       15.    The E-maintenance system is a computerized program that was tailored to

22  maintaining older conventional Tugboats, not the five Tugboats at issue, which were newer

23  tractor tugs with Z-drives requiring much more maintenance. *Id.* at 195. The Tugboats were on a

1   two and a half-year predictive Zinc (cathode protection) inspection plan, but HMS placed them

2   on a five-year inspection plan. *Id.* at 206-207. The records contained in the E-maintenance

3   program relied upon input from an HMS employee, normally Ravi Sakho, Greg Nelson, or Brian

4   Appleton. *Id.* at 193. Mr. Appleton did not trust E-maintenance records because he found

5   discrepancies between maintenance work on a Tugboat that was logged into the E-maintenance

6   system as performed or completed, when his visual inspection of the Tugboat revealed the work

7   logged into the E-maintenance system had not been done. *Id.* at 194.

8       16.    During the term of the Bareboat Charter Agreements, the LELA FRANCO and

9   MICHELLE SLOAN were inspected when a line was tangled in its wheel (propeller) and found

10   to have 85-90 percent Zinc loss. *Id.* at 204-205; VRP 8/25/22, p. 164.  A Zinc is a piece of Zinc

11   metal that is attached to the hull of the Tugboats to provide cathodic protection related to

12   electrolysis. *Id.* at 205. Stray voltage is one cause of Zinc loss and HMS did not perform any

13   inspection to diagnose whether any of the Tugboats had stray voltage problems. *Id.* at 207. The

14   inspection revealed in addition to Zinc loss, the LELA FRANCO had corrosion and pitting to the

15   hull weld seams which potentially can result in a rupture of the hull. *Id.* at 205-206; VRP

16   8/25/22, p. 163-164.  Although HMS should have placed the LELA FRANCO into dry dock to

17   replace the Zincs and effect hull repair, including grinding the hull paint, recoating the hull and

18   rewelding hull seams, no repair work was performed. *Id.* at 206.

19       17.    The DR. HANK KAPLAN was also inspected below the water line when it was

20   placed into dry dock to repatch its wheels (propellor). *Id.* 208. Nothing was done to replace Zincs

21   that had significant wastage and loss, and no investigation of Zinc failure was performed. *Id.*

22       18.    Mr. Carlson testified that the DR. HANK KAPLAN was the only Tugboat that

23   had zinc or electrolysis issues early on and that the zinc issues were discovered "much later" on

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 11

1   the LELA FRANCO and MICHELLE SLOAN, "and the other vessels were not inspected until

2   return." VRP 8/25/22, p. 192.

3       19.   HMF normally prepared boats that it chartered and were being redelivered to an

4   owner by inspecting and effecting needed repairs. *Id.* at 214. Usually when a boat is redelivered

5   to the owner, the charterer will place the boat into dry dock to examine the hull and perform

6   needed repairs. 8/22/22 p. 212-213. This is normally done in advance because it can be hard to

7   schedule dry dock time. *Id.* HMF did not schedule dry dock inspection and did not perform any

8   work to prepare any of the Tugboats for redelivery to Tug Construction. *Id.* at 214. Mr. Appleton

9   was involved in the redelivery of about 15 other vessels chartered by HMF and the redelivery of

10  each of these vessels involved an inspection and performance of needed repairs. VRP 8/22/22. p.

11  214. Mr. Appleton discussed the need to inspect the Tugboats upon redelivery with HMF

12  employees Matt Godden and Steve Carlson and was told HMF was not doing anything, other

13  than to remove HMF property from each Tugboat. *Id.* at 214-215. HMF did not perform

14  inspections below the waterline of the Tugboats after notices of termination of the Bareboat

15  Charter Agreements were issued and before each vessel was tendered for redelivery. VRP

16  8/25/22, p. 188. Mr. Carlson discussed redelivery with Mr. Godden separately and only

17  discussed equipment HMF would remove. VRP 8/24/22, p. 185-186.

18      20.   After Tug Construction sent HMF notices of termination of the Bareboat Charter

19  Agreements, Tug Construction and HMF agreed to engage William Kelley to serve as the

20  parties' off hire surveyor. A joint off hire surveyor represents both parties, and each party is

21  bound by the joint surveyor's findings and recommendations regarding needed repairs. VRP

22  8/23/22, p. 85-88; VRP 8/25/22, p. 136.

23

21.     Mr. Kelley is an expert in performing surveys of vessels for redelivery with many years of experience to both on hire and off hire, and his expertise was acknowledged by another expert, Charles Walther. VRP 8/23/22, p. 145-154; VRP 8/26/22, p. 41-42.

22.     Mr. Kelley reviewed each Bareboat Charter Agreement. VRP 8/23/22, p. 155-159. He went to DMS and examined its records regarding the construction, inspection, testing and acceptance of each of the Tugboats chartered to HMF. VRP 8/23/22, p. 160-162. Mr. Kelley also began to search for dry dock facilities capable of handling tractor tugs such as the five Tugboats that would be available on short notice. VRP 8/23/22, p. 163-164. Using past connections, Mr. Kelley arranged to have the DR. HANK KAPLAN, EARL WE. REDD, MICHELLE SLOAN, and RICH PADDEN drydocked at Foss Shipyards. VRP 8/23/22, p. 166-167. Mr. Kelley made these arrangements independent of any direction from the parties. *Id*. at 168-169. Mr. Kelley also arranged for dry docking of the LELA FRANCO, which was seized by the U.S. Marshal in Los Angeles, California.

23.     Mr. Kelley arranged for dry docks because he knew some of the Tugboats had electrolysis issues to their hulls which required inspection and the need for the hull to be grinded, painted and rewelded. VRP 8/25/22, p. 169, 179.

24.     After arranging for dry docking, Mr. Kelley had the DR. HANK KAPLAN, EARL W. REDD, MICHELLE SLOAN, AND RICH PADDEN towed from Seattle to the Foss Shipyard dry dock facilities because the HMF crews for each vessel declined to move them to dry dock. VRP 8/23/22, p. 167, 168, 179.

25.     After each of these four Tugboats were towed to Foss Shipyard, Mr. Kelley had a preliminary underwater inspection of each Tugboat's hull performed by a remote operating vehicle ("ROV") to assess the need for dry docking and the potential scope of work. VRP

1  8/23/22, p. 180. Based upon the ROV inspection, Mr. Kelly concluded dry docking was needed

2  to complete a thorough inspection of the hull of each Tugboat and to effect necessary repairs.

3  VRP 8/23/22 p. 181-182; 189-193; 201-202, 204-204; and Exhibits 11,12,29 and 74.

4       26.    Mr. Kelley inspected the LELA FRANCO in Los Angeles after it was arrested by

5  the U.S. Marshal.  VRP 8/23/22, p.9, 94-95.  Mr. Kelley had a dive survey performed and

6  concluded the LELA FRANCO needed to be placed into dry dock for necessary repairs. VRP

7  8/23/22, p. 206, 208-209; and Exhibit 51.

8       27.    Although HMF originally agreed that Mr. Kelley would perform a joint off hire

9  survey of each Tugboat, HMF terminated the agreement. VRP 8/25/22, p. 136. HMF did not

10 discuss with Tug Construction the retention of a different joint off hire surveyor and

11 independently hired Scott Duncan to serve as HMF's off hire surveyor. Mr. Kelley first learned

12 Mr. Duncan was HMF's off hire surveyor when Mr. Duncan appeared for an inspection of the

13 DR. HANK KAPLAN and informed Mr. Kelly that he was retained as HMF's surveyor. VRP

14 8/23/22, p. 177-178; VRP 8/24/22, p. 59-60.  Mr. Kelley advised Tug Construction that HMF

15 had hired its own off hire surveyor and was instructed by Tug Construction to continue with the

16 redelivery process including performance of any work necessary to return each Tugboat to the

17 condition set forth in each Bareboat Charter Agreement. VRP 8/23/22, p. 88-90. Tug

18 Construction did not direct the redelivery inspection and repair process and instead relied upon

19 Mr. Kelley's judgment and decisions in this regard. VRP 8/23/22, p. 90.

20      28.    Mr. Kelley first inspected the DR. HANK KAPLAN. HMF representative Steve

21 Carlson was present but did not participate in the inspection and declined to provide Mr. Kelley

22 with the Tugboat's engine room and deck logs that are normally reviewed to confirm what

23 maintenance has been performed. VRP 8/23/22, p. 173-174; VRP 8/24/22, p. 166-167. When Mr.

1   Kelley was hired to perform a joint survey, Mr. Kelley reached out to Mr. Carlson at HMF to

2   discuss the survey. VRP 8/25/22, p. 187-188. Mr. Carlson did not engage or communicate with

3   Mr. Kelley other than indicating when he was on the DR. HANK KAPLAN that he felt

4   drydocking the DR. HANK KAPLAN was not needed and would not be conducted. VRP

5   8/23/22, p. 176.

6       29.   After each Tugboat was placed into dry dock at Foss Shipyards, a Condition

7   Found Report ("CFR") was generated for each Tugboat. Mr. Kelley reviewed each Condition

8   Found and would either authorize work to address the condition as beyond ordinary wear and

9   tear or reject the work request as falling within ordinary wear and tear, and outside the Bareboat

10  Charter Agreement. *See e.g.* VRP 8/23/22, p. 195-196, 198, 215-216. Mr. Kelley provided each

11  of the CFRs to Mr. Carlson of HMS, but Mr. Carlson would not discuss them with Mr. Kelley.

12  VRP 8/23/22, p. 194-195.

13      30.   Mr. Kelley hired certified mechanics from Caterpillar ("CAT") the manufacturer

14  of each Tugboat to inspect the Tugboats' engines and generators. Their inspection indicated

15  these components were in an acceptable condition, but the components' computer systems

16  revealed HMS had not performed periodic tune-ups needed to maintain the components'

17  warranties. Mr. Kelley ordered the tune-up be performed. VRP 8/23/22, p. 198, 201.

18      31.   After the repairs on each Tugboat were completed, Foss Shipyard created Work

19  Complete Reports ("WCR") for each Tugboat that included initial work orders; Foss Shipyard

20  invoices for the costs of the repair work performed and completed; and photographs of the

21  Conditions Found and work done. *See* Exhibits 111-117. Mr. Kelley confirmed the WCRs as to

22  the cost, scope and necessity of repair work performed on the Tugboats needed to return them to

23  the condition set forth under the Bareboat Charter Agreements. VRP 8/23/22, p. 218, 222; VRP

8/24/22, p 5-43.

32.     Mr. Kelley reviewed all the work performed and invoices by the Al Larson Boat Shop in Los Angeles for repairs done on the LELA FRANCO. VRP 8/24/22, p. 43-44, and Exhibit 53.  Mr. Kelley also billed Tug Construction for the services he provided, and Tug Construction paid his bill in the amount of $49,429.59. VRP 8/24/22, p. 44-45; Exhibits 96-99.

33.     The repair work that Mr. Kelley detailed and the costs for such work occurred while each Tugboat was still under charter to HMF pursuant to the Bareboat Charter Agreements. Each Bareboat Charter Agreement provided: (1) each charter term commenced no later than the date HMS accepted and assumed control of the Tugboat and continued until the Tugboat is redelivered as set forth in the charter agreement; (2) HMF as Charterer is responsible for all charges and expenses relating to the Tugboat and its operation during the charter term; (3) HMF as charterer shall make all repairs, replacements and maintenance necessary to keep the Tugboat in the same good condition, repair and working order as when delivered, less normal wear and tear; (4) each Tugboat is not deemed redelivered until at the agreed redelivery location and in the same good condition, repair and working order as upon delivery, less ordinary wear and tear. If HMF as charterer tenders the Tugboat damaged and/or in need of repair, hire shall continue during the time required for such repairs and the Tugboat shall not be deemed redelivered until restored to the same good condition, repair and working order as upon delivery, less ordinary wear and tear; (5) HMF as "Charterer shall procure and maintain, at its expense, the following insurances upon the Tugboat during the charter term"; and (6) HMF as charterer must pay hire, at the rate contained in the Bareboat Charter Agreements, from delivery to redelivery, with payment due monthly in advance on the first day of each month, unless otherwise agreed.

34.     Prior to redelivery, as defined by the Bareboat Charter Agreements, Tug Construction incurred the following insurance costs: DR. HANK KAPLAN, $15,960; MICHELLE S. SLOAN, $13,611; RICH PADDEN, $15,679; EARL W. REDD, $26,869; and LELA FRANCO, $9,813. VRP, 8/25/22, p. 9, l. 10 – 14.

35.     Prior to redelivery, as defined by the Bareboat Charter Agreements, bareboat charter hire continued to accrue for the following durations and amounts: DR. HANK KAPLAN: March 1, 2019 – April 12, 2019, $136,684.67 (Ex. 14, 15, 17); EARL W. REDD: March 1, 2019 – April 29, 2019, $213,471 (Ex. 31, 32, 33); LELA FRANCO, April 1, 2019 – May 6, 2019, $76,092 (Ex. 57, 58, 59*); MICHELLE S. SLOAN, March 1, 2019 – April 12, 2019, $87,129.56 (Ex. 76, 75, 77); RICH PADDEN, March 1, 2019 – April 25, 2019, $152,445.60 (Ex. 89, 90, 91); VRP, 8/25,/22, p. 15, l.11-22, p. 16, l.20 – p. 17, l.19; p. 21, l.11 – p. 24, l.27, p. 52, l.1-12.

36.     Mr. Kelley summarized the costs that Tug Construction incurred pursuant to the Bareboat Charter Agreements prior to redelivery, inspection, and repair work to the Tugboats in an expert report. Exhibit 94. Mr. Kelley made two corrections at trial. The cost for the repair of the MICHELLE SLOAN was $161,168, and the costs for engine repairs to the LELA FRANCO of $300,000 should be $8,551. VRP 8/24/22, p. 46, 52, 54-55. In his written report, Mr. Kelly placed an asterisk next to the $300,000 costs for engine repair for the LELA FRANCO. Mr. Kelley explained that cost was provisional, which is why an asterisk was placed next to it, and subject to testing which later revealed $8,551 in repairs were needed.

37.     Tug Construction paid the costs set forth by Mr. Kelley with the adjustments he noted at trial. *Id.,* VRP 8/25/22, p. 6-8. Mr. Kelley set forth the total amount of costs incurred by Tug Construction as follows:

1

<u>DR. HANK KAPLAN</u>

2

| | |
|---|---|
| Berth charges pre-drydock | 283.20 |
| ROV survey | 3,500.00 |
| International Paint | 2,235,00 |
| Drydocking, and repairs including CAT | 116,318.71 |
| Western Towboat | 2,620.00 |
| Continuing charter hire 2/1-4/1/19 | 136,684.67 |
| Insurance 2/1-4/1/19 | 15,960.00 |
| **TOTAL** | **277,601.58** |

3

4

5

6

<u>MICHELLE SLOAN</u>

7

| | |
|---|---|
| Berth charges pre-drydock | 283.20 |
| ROV survey | 3,500.00 |
| International Paint | 2,419,00 |
| Drydocking, and repairs including CAT | 161,168.71 |
| Western Towboat | 2,620.00 |
| Continuing charter hire 2/1-4/12/19 | 87,129.56 |
| Insurance 2/1-4/12/19 | 13,611.00 |
| **TOTAL** | **270,731.36** |

8

9

10

11

12

<u>RICH PADDEN</u>

13

| | |
|---|---|
| Berth charges pre-drydock | 1,557.60 |
| ROV survey | 3,500.00 |
| International Paint | 2,785.00 |
| Drydocking, and repairs including CAT | 138,489.91 |
| Western Towboat | 2,620.00 |
| Continuing charter hire 2/1-4/25/19 | 152,445.60 |
| Insurance 2/1-4/25/19 | 15,679.00 |
| **TOTAL** | **317,077.11** |

14

15

16

17

<u>EARL W. REDD</u>

18

| | |
|---|---|
| Berth charges pre-drydock | 3,427.60 |
| ROV survey | 3,500.00 |
| International Paint | 3,993.00 |
| Drydocking, and repairs including CAT | 68,467.06 |
| Western Towboat | 2,329.60 |
| Continuing charter hire 3/1-4/12/19 | 213,471.00 |
| Insurance 3/1-4/12/19 | 26,869.00 |
| **TOTAL** | **322,057.26** |

19

20

21

22

23

<u>LELA FRANCO</u>

| | |
|---|---|
| Terminal Assist charge, Ex. 55 | 7,559.00 |
| ROV survey | 10,720.00 |
| Drydocking, and repairs | 108,766.48 |
| CAT | 8,551.00 |
| Continuing charter hire 4/1-5/6/19 | 76,092.68 |
| Insurance 4/1-5/6/19 | 9,813.00 |
| **TOTAL** | **221,502.16** |

The total set forth by Mr. Kelley is **$1,408,970.27**.

38.     Charles Walter, an expert retained by HMF, disputed the costs incurred by Tug Construction that were based upon Mr. Kelley's survey and ordered repair work. Mr. Walter did not inspect the Tugboats and did not participate in the surveys or repair work performed on the Tugboats. VRP 8/26/22, p. 12-16. Mr. Walter opined when HMF tendered the Tugboats for redelivery, none had to be towed or placed into Dry Dock and none of the repairs were necessary. VRP 8/25/22, p. 201. Mr. Walter's opined the only repairs for which HMF is responsible are for items above the waterline and in the following amounts: LELA FRANCO ($10,169.11); DR. HANK KAPLAN ($236.11); RICH PADDEN (0$); EARL W. REDD (13,276.64) and MICHELLE SLOAN ($9,763.74). VRP 8/25/22, p. 206-210, Exhibits 53, 118, 120, and 121. Although he did not identify a design defect in any Tugboat, he suggested the wastage to the Zincs on the Tugboats' hull and other damage was caused by a design defect. There is no factual support for this suggestion and thus no basis to accept it as a cause of the damage set forth above that was found below the water line of the Tugboats and which required repairs. Moreover, under each Bareboat Charter Agreement, each Tugboat was bareboat chartered to and accepted by HMS on an "AS-IS" basis with no Warranty or representation of any kind or nature whatsoever by the owner, Tug Construction. Under each Bareboat Charter Agreement, HMS specifically acknowledged and agreed the owner, Tug Construction, chartered

the Tugboats to HMS without warranty of any kind regarding the condition or fitness of each Tugboat.

39.     Additionally, although Mr. Walter opined the Tugboats did not need to be placed into dry dock for repairs, the opinion is not supported by the evidence regarding the actual condition of the Tugboats' hulls below the water line. The actual condition of each Tugboat's hull supports Mr. Kelley's determination that each Tugboat needed to be placed into dry dock for further assessment, and following that assessment, repairs to the hulls of each Tugboat were required as set forth in Mr. Kelley's expert report, the work orders and the invoices for work performed.

40.     The parties spar over whether Mr. Kelley or Mr. Walter is more credible. The Court finds the testimony and evidence presented by Mr. Kelley more accurately sets forth what inspections needed to be performed upon the Tugboats when they are being prepared for redelivery to an owner, the actual condition of each Tugboat when they were tendered by HMF or seized by the U.S. Marshal, the need to dry docking each Tugboat to inspect and repair them, and the scope and costs of repairs that were performed to return each Tugboat to the condition set forth in the Bareboat Charter Agreements. The Court finds Mr. Kelley did not improperly increase costs to HMF by delaying or slowing the time to find dry dock space for the Tugboats or in the time to repair each Tugboat, and that he appropriately rejected requests for repair work requests outside the scope of each Bareboat Charter Agreement.

41.     The Court finds Mr. Kelley reviewed the work requests, properly authorized, and denied work requests, and submitted the invoices for the work that he authorized to Tug Construction which then paid each of the invoices. The Court finds the invoices are proper in their amounts and not excessive for the work done.

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 20

1

2      42.      The Court rejects HMF's request to exclude or disregard all evidence presented

3   by Mr. Kelley. That request largely hinges on the argument that because Mr. Kelley's initial

4   expert report indicated $300,000 in costs for engine work on the LELA FRANCO, all his

5   testimony should be rejected. Mr. Kelley's report noted the $300,000 item with an asterisk

6   because it was contingent on further testing by the manufacturer, CAT. Subsequent testing

7   showed repair work of $ 8,551.00 and $300,000 was needed and Mr. Kelley so testified.

8                            **CONCLUSIONS OF LAW**

9      43.      Generally, admiralty law applies to all maritime contracts. *Aqua-Marine*

10  *Constructors, Inc. v. Banks,* 110 F.3d 663, 670 (9th Cir. 1997); *see also* 28 U.S.C. § 1333(1).

11  Under admiralty law, a bareboat charter constitutes a near "outright transfer of ownership."

12  *Tidewater Barge Lines, Inc. v. The Port of Lewiston, et al*., No. 03–CV–1225–ST, 2005 WL

13  3992463, at *7 (D. Or. Oct. 21, 2005) (quoting *Guzman v. Pichirilo*, 369 U.S. 698, 700 (1962)).

14  "Under a bareboat charter, the owner gives the charter full possession and control of the vessel

15  for a period of time." *Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc*., 1 F.3d 848, 849 n.1

16  (9th Cir. 1993). In a bareboat charter, the charterer "is personally liable for the unseaworthiness

17  of a chartered vessel ..." *Reed v. S.S. Yaka*, 373 U.S. 410, 412 (1963), reh'g denied, 375 U.S. 872

18  (1963) (superseded by statute on other grounds), and the owner is not liable to the bareboat

19  charterer for any claims of unseaworthiness.

20      44.      The parties entered into Bareboat Charter Agreements for the DR. HANK

21  KAPLAN, EARL W. REDD, LELA FRANCO, MICHELLE SLOAN, and RICH PADDEN, that

22  are governed by the law of admiralty. The Court accordingly has jurisdiction over the matter

23  under 28 U.S.C. § 1333, and venue is proper under 28 U.S.C. §1391(b).

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 21

45.     The EARL W. REDD, LELA FRANCO, MICHELLE SLOAN, and RICH

PADDEN were newly constructed, delivered to, and accepted by HMS pursuant to Bareboat

Charter Agreements at DMS where they were built and were under HMS control from that point.

The DR. HANK KAPLAN was also newly constructed and accepted for delivery but subject to

exceptions set forth in a punch-list that involved vibration issues, which issues were

subsequently completed by DMS.

46.     Under each Bareboat Charter Agreement, prior to or at delivery, each Tugboat

shall be surveyed to comprehensively document its condition. Under each Bareboat Charter

Agreement, the parties may agree upon an appropriate method by which to survey the Tugboat

and establish its condition, including drydocking and/or underwater inspection, but any method

agreed must include written and photographic documentation.

47.     Each Tugboat was subject to an on-hire survey during construction and following

construction before HMS accepted each Tugboat for delivery. The on-hire surveys on each

Tugboat were conducted by Mr. Appleton representing HMS and Tug Construction, DMS, and

CAT representatives. The parties' conduct establishes the on-hire survey was agreed upon and

there is no evidence to the contrary. Each of the on-hire surveys performed by this group of

individuals met the terms of each Bareboat Charter Agreement because each Bareboat Charter

Agreement does not specifically state and thus does not require that another separate on-hire

survey be performed by another individual before HMS accepted each of the Tugboats.

48.     Each Bareboat Charter Agreement states that, at the conclusion of the charter term

(or sooner, at the Owners' option in the event of default), an off-hire survey of the Tugboat shall

be conducted upon the same method utilized for the on-hire survey, to establish the condition of

1  the Tugboat for redelivery and that every effort shall be made to have the off-hire survey

2  conducted by the same person who conducted the on-hire survey. This language requires that an

3  off-hire survey be performed to establish the condition of the Tugboat using the same "method"

4  used during the "on-hire" survey. "Method" under each Bareboat Charter Agreement is defined

5  as a way of examining each Tugboat "including drydocking and/or underwater inspection."

6  "Method" is not defined under the Agreement and does not mean that a separate survey must be

7  performed by an independent on-hire surveyor, in addition to any other surveys performed. That

8  a separate on-hire survey, in addition to the survey of each Tugboat was not performed, thus does

9  not obviate, or void the requirement that an off-hire survey is required under each Bareboat

10  Charter Agreement to determine the condition of each Tugboat tendered for redelivery by HMF

11  to Tug Construction, or that Tug Construction breached each Bareboat Charter Agreement.

12      49.    Each Bareboat Charter Agreement also included a provision that "every effort

13  shall be made to have the off-hire survey conducted by the same person who conducted the on-

14  hire survey." Here, Tug Construction and HMF initially agreed that Mr. Kelley would perform a

15  joint off-hire survey. HMF backed out of the agreement to utilize Mr. Kelley as a joint surveyor

16  and hired Mr. Scott Duncan to inspect the vessels solely for HMF, and without consultation with

17  Tug Construction. Mr. Appleton, the HMS employee who was central to the survey performed

18  on each vessel before acceptance by HMS, indicated he discussed the need inspect each of the

19  vessels before redelivery with Mr. Carlson and Mr. Godden and was told HMF was not doing

20  anything, other than to remove HMF property from each Tugboat. Under these circumstances,

21  Tug Construction cannot be said to have breached the Bareboat Charter Agreements' language

22  that every effort should be made to have the off-hire survey performed by the same person who

23  conducted the on-hire survey. Additionally, the language of each Bareboat Charter Agreement

1   does not require that only an agreed upon off-hire surveyor can perform the survey of each

2   Tugboat when tendered for redelivery. Rather, each Bareboat Charter Agreement states "every

3   effort shall be made," and for this reason also, the Court finds Tug Construction did not violate

4   the terms of the Bareboat Charter Agreements in regard to the off-hire survey.

5          50.     The Court finds that Defendant HMF breached each of the Bareboat Charter

6   Agreements by first failing to redeliver each of the Tugboats in the condition required under the

7   Bareboat Charter Agreements. Under each Bareboat Charter Agreement, HMF was required to

8   redeliver each vessel "in the same good condition, repair and working order as upon delivery,

9   less ordinary wear and tear, which did not include any condition that was avoidable or

10  correctable through routine maintenance." Each Tugboat was tendered for redelivery in a

11  condition inconsistent with the terms of the Bareboat Charter Agreements and which required

12  substantial work and expense to return each vessel to the condition set forth in the Bareboat

13  Charter Agreements.

14         51.     Additionally, the term "redeliver" in the Bareboat Charter Agreements is a term of

15  art. Under each agreement, a Tugboat is not deemed redelivered until it is tendered at the agreed

16  redelivery location and in the same good condition, repair and working order as upon delivery,

17  less ordinary wear and tear. If the charterer tenders the Tugboat damaged and/or in need of

18  repair, hire shall continue during the time required for such repairs and the Tugboat shall not be

19  deemed redelivered until restored to the same good condition, repair and working order as upon

20  delivery, less ordinary wear and tear. HMF did not tender the Tugboats in the same good

21  condition, repair and working order as upon delivery, less ordinary wear and tear as required by

22  each Bareboat Charter Agreement and thus, HMF was required to pay the charter hire rates and

23  insurance set forth above and which accrued until the vessels were restored to the same good

1   condition mandated by the Bareboat Charter Agreements.

2       52.     Because HMF breached the Bareboat Charter Agreements, HMF is responsible

3   for the costs and expenses that Tug Construction incurred to bring each Tugboat back to the

4   condition each Bareboat Charter Agreement required and for the hire fees and insurance costs

5   that continued for each Tugboat until each met the redelivery terms and requirements set forth in

6   the Bareboat Charter Agreements. Those costs and expenses total $1,408,502.16.

7       53.     Each Bareboat Charter Agreement also provides that charterer, HMF is

8   responsible for all charges and expenses during the charter term and amounts due to the owner,

9   Tug Construction shall accrue interest at the rate of one percent (1%) per month. Tug

10  Construction has paid all the costs related redelivery, repair, and insurance and is thus entitled to

11  1% per month interest on these costs and expense as well as the continuing charter hire charges set

12  forth in the Bareboat Charter Agreements.

13      54.     Each Bareboat Charter Agreement further states any suit filed relating to this

14  agreement must be filed in Seattle, Washington, with the substantially prevailing party to recover

15  its legal fees and costs. Each Bareboat Charter Agreement directs that fees and costs shall be

16  awarded to the "substantially prevailing party." HMF argues Tug Construction is not the

17  "substantially prevailing party" because HMF did not breach the Bareboat Charter Agreements

18  and is responsible for only $54,073.22 of the $1,408,502.16 that Tug Construction seeks for

19  repair and hire fees. The Court has found otherwise as discussed above.

20      55.     HMF notes federal courts have not considered the definition of "substantial

21  prevailing" in maritime cases. Each Bareboat Charter Agreement states that in the absence of an

22  applicable general maritime rule of law, disputes shall be governed by the laws of the State of

23  Washington. In Washington, determining the "substantially prevailing party ... depends upon the

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 25

extent of relief afforded the parties." *Riss v. Angel*, 131 Wn.2d 612, 633 (1997). The Court finds Defendant HMF breached each of the Bareboat Charter Agreements and as a result of these breaches, Tug Construction is owed by HMF, $1,408,502.16 for repair costs, hire fees and insurance costs. Based on the "extent of relief" standard, the Court finds that Tug Construction is the "substantially prevailing party" and entitled to recover reasonable attorney's fees and costs.

56.     Therefore, Tug Construction shall submit to the Court proposed fees and cost, keeping in mind that in Washington, the "lodestar" method is the starting point for fee calculations. The lodestar fee is determined by multiplying the hours reasonably expended in the litigation by each lawyer's reasonable hourly rate of compensation. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597 (1983). The burden of demonstrating that a fee is reasonable is on Tug Construction, who must provide documentation sufficient to "inform the court, in addition to the number of hours worked, of the type of work performed and the category of attorney who performed the work (*i.e.* senior partner, associate, etc.)." *Bowers,* 100 Wn.2d at 59.

57.     In evaluating the reasonableness of a fee award, the Court may consider the relationship between the amount in dispute and the fee requested and the hourly rate of opposing counsel. *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 66 (1987). Although the reasonableness of a fee request depends on the circumstances of each individual case, the determination of a fee award should not become an unduly burdensome proceeding for the court or for the parties. An explicit hour-by-hour analysis of each lawyer's time sheets is unnecessary if the award is made with a consideration of the relevant factors and reasons sufficient for review are given for the amount awarded.

58.     In sum, the crux of this case is whether HMF breached the requirements set forth in each Bareboat Charter Agreement to redeliver each Tugboat in a condition in compliance with

the terms of each Bareboat Charter Agreement. The Court finds that Defendant HMF breached each of the Tugboats' Bareboat Charter Agreements and that as a result, Tug Construction incurred significant repair and other costs. Under the Bareboat Charter Agreements, HMF is also liable for and responsible for each Tug Construction's hire fees, insurance costs and interest for the period of time it took to meet the requirements set forth for redelivery of each Tugboat. The Court awards $1,408,502.16 to Tug Construction, not including the 1% interest that is yet to be calculated. Each Bareboat Charter Agreement directs that a substantially prevailing party is entitled to fees and costs. The Court finds that under the extent of relief standard, Tug Construction is the substantially prevailing party and entitled to attorney fees and costs.

For the reasons above, the Court finds Tug Construction is entitled to entry of judgment in its favor and against HMF in the amount of:

1.      $1,408,502.16 for repair costs, hire fees and insurance costs, along with interest under the Bareboat Charter Agreements, and reasonable attorney fees.

2.      Tug Construction shall provide its request for interest and attorney fees to the Court by **November 3, 2022**. HMF may respond to Tug Construction's request for interest and attorney fees no later than **November 10, 2022**. The Clerk shall note the matter for **November 17, 2022** as ready for the Court's consideration.

3.      After determining interest, attorney fees and costs to be awarded, the Court will direct the Clerk to enter final judgement.

DATED this 27th day of October, 2022.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 27